[No. AO19468. First Dist., Div. Five. Mar. 22, 1984.]

COUNTY OF ALAMEDA, Plaintiff and Appellant, v.
FAIR EMPLOYMENT AND HOUSING COMMISSION,
Defendant and Respondent;
SACHES CAULFIELD, Real Party in Interest and Respondent.

500

Richard J. Moore, County Counsel, and Willie Lott, Jr., Deputy County Counsel, for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, and Marian M. Johnston, Deputy Attorney General, for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

## OPINION

**LOW, P. J.**—The County of Alameda (County) appeals from a judgment of the superior court denying its petition for writ of mandate (Code Civ. Proc., § 1094.5) to compel defendant Fair Employment Housing Commission (Commission) to set aside its findings: (1) that the County had wrongfully denied Saches Caulfield employment as a cook at the Santa Rita jail because of her race and gender in violation of the California Fair Employment and Housing Act (Gov. Code, § 12940, subd. (a)); and (2) that the Commission properly granted her backpay with benefits and credited her

with retroactive seniority from October 1974. The County contends: (1) the findings of Commission were not supported by substantial evidence; (2) the County's policy of hiring only male cooks for Santa Rita's male prison is justified because gender is a bona fide occupational qualification (bfoq) for that position; and (3) that Caulfield's award of backpay should be offset by any unemployment benefits received by her and that fringe benefits should not have been included in the award. We affirm.

Initially, we note that the substantial evidence test is to be applied in reviewing the decision of the Commission. (See *American National Ins. Co.* v. *Fair Employment & Housing Com.* (1982) 32 Cal.3d 603, 607 [186 Cal.Rptr. 345, 651 P.2d 1151].) The decision of the Commission may be set aside as an abuse of discretion only if, after a review of the entire record, it can be said that the record is so lacking in evidentiary support as to be unreasonable. (See *Northern Inyo Hosp.* v. *Fair Emp. Practice Com.* (1974) 38 Cal.App.3d 14, 24 [112 Cal.Rptr. 872].) A Commission's findings should not be set aside simply because a contrary finding may also appear to be reasonable. (*Id.*, at p. 24.)

In May 1974, Saches Caulfield, a black woman, applied for the job of cook with the Sheriff's Department of Alameda County. Caulfield had 20 years of prior experience as a cook when she applied for the job. She also achieved a score of 84.5 on an eligibility examination given by the County. The score placed Caulfield at the top of the eligibility list. Caulfield was interviewed for the position by Juan Cruz, food service manager for the County, and was told that she had achieved the highest score of all of the applicants and that she would be hired if Cruz had anything to do with it, but that the decision would be made downtown. As part of the job interview, Caulfield was also interviewed by one of the guards at the prison. He told her that the black female inmates would be asking Caulfield to call their boyfriends on the outside.

In October 1974, the County hired Christa Smart, a white woman, for the permanent cook position at the Sheriff's Department Santa Rita Women's Prison. Smart was second on the eligibility list behind Caulfield with a score of 82.0 and her prior cooking experience was substantially less than Caulfield's. This was the first time that food service manager Cruz had not hired the applicant with the highest test score, i.e., Caulfield.

Ms. Caulfield was hired as a cook by the County probation department in October of 1975 on a services-as-needed basis and was hired as a permanent cook with that department in 1978.

During the relevant years, the sheriff's department had a policy of hiring female cooks only for women's quarters or facilities, and male cooks only for men's facilities.

Whether Caulfield was the subject of racial discrimination is a question of fact. Although the wording of the Fair Employment Housing Act and title VII of the Federal Civil Rights Act of 1964 (see 42 U.S.C. § 2000e et seq.) differs in some particulars, the antidiscriminatory objectives and the overriding public policy purposes are identical and we refer to those federal decisions where appropriate. (See *Price* v. *Civil Service Com.* (1980) 26 Cal.3d 257, 271, 276 [161 Cal.Rptr. 475, 604 P.2d 1365]; *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 329-330 [171 Cal.Rptr. 917], citing with approval *McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792, 802-807 [36 L.Ed.2d 668, 677-680, 93 S.Ct. 1817].)

■ Under both state and federal antidiscrimination legislation, the employee must first establish a prima facie case of wrongful, i.e., racial, or gender-based termination. (*McDonnell Douglas Corp.* v. *Green, supra,* 411 U.S. at p. 802 [36 L.Ed.2d at p. 677].) This may be done by showing (1) that he or she belongs to a racial minority; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that despite his qualification, he was rejected; and (4) that after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. Once a prima facie case of racial discrimination has been established, the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Finally, if the employer does give a reason for the rejection, the complainant is then given the opportunity to show that these reasons are but a mere pretext: "In short, on the retrial respondent [complainant] must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his rejection were in fact a coverup for a racially discriminatory decision." (*McDonnell Douglas Corp.* v. *Green, supra,* at p. 805 [36 L.Ed.2d at p. 679]; cf., *Pugh* v. *See's Candies, Inc., supra,* 116 Cal.App.3d at pp. 329-330.)

■ The evidence establishes that Caulfield made a prima facie case of racial discrimination: Caulfield is a black woman; she applied for the job of cook for which the County was seeking applicants; she was well qualified for this position and the County continued to interview other qualified persons for the position. The evidence demonstrates that after Caulfield was rejected by the County, Christa Smart was hired with similar qualifications but less experience. The relevant work experience and eligibility score of

Smart indicates that the County hired a less qualified applicant than Caulfield.

In its rebuttal, the County, through food service manager Cruz, testified that he was responsible for the hiring of cooks at Santa Rita jail. Cruz interviewed both Caulfield and Smart and was familiar with both of their prior cooking experiences. Cruz testified that after the interviews, he felt Smart was better qualified than Caulfield. Cruz did not elaborate however.

The Commission found that the County had given a legitimate nondiscriminatory reason for not hiring Caulfield.[1] However, the Commission then found that these reasons were but a pretext and held that there was evidence of discrimination. Of paramount importance was the testimony by Cruz in which he admitted that it was the first time in nine years that he had not hired the applicant with the highest eligibility score, i.e., Caulfield. The Commission also credited Caulfield's testimony that Cruz told her in the initial interview that it was his preference to hire her. Cruz did testify that he felt the other applicant's, Smart's, prior cooking experience with high school students was more relevant than Caulfield's restaurant work because he likened students to prison inmates. The Commission considered this comparison to be unrealistic. We agree.

There was some suggestion that Smart, hired in place of Caulfield, was also a member of a minority since she appeared to have black facial characteristics. This evidence is insufficient to rebut the Commission's finding that the County discriminated against Caulfield on the basis of her race.

■ The County next contends that it is justified in rejecting Caulfield because of its policy of hiring only male applicants to cook in the Greystone facility.[2] In support of its contention, the County argues that a gender-based classification in the Greystone kitchen is a bfoq because (1) the inmates' rights of privacy would be violated if a woman were allowed to work in the kitchen, and (2) prison security could be disrupted by the presence of a female cook.

■ " '[I]n order to rely on the bona fide occupational qualification exception, an employer has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved.' " (*Long* v. *State Personnel Bd.* (1974) 41 Cal.App.3d 1000,

---

[1] The Commission did note that they found the reasons given by the County unconvincing.
[2] Greystone is a maximum security male prison at the Santa Rita facility.

1016 [116 Cal.Rptr. 562], citing *Weeks* v. *Southern Bell Telephone & Telegraph Company* (5th Cir. 1969) 408 F.2d 228, 235 [12 A.L.R.Fed. 1].)

The leading case of *Dothard* v. *Rawlinson* (1977) 433 U.S. 321 [53 L.Ed.2d 786, 97 S.Ct. 2720], held that in certain situations women can be excluded from working as prison guards because of their gender. The prison in *Dothard* was maximum security and was viewed as "peculiarly inhospitable." (*Id.,* at p. 334 [53 L.Ed.2d at p. 800].) Because of the inadequate staff and facilities, the guards would be working inside dormatories which housed large groups of aggressive inmates rather than inmates segregated on a cell-by-cell basis. Plaintiff contended that she was entitled to decide for herself whether she would be safe if hired as a guard. The court disagreed, concluding "[m]ore is at stake in this case, however, than an individual woman's decision to weigh and accept the risks of employment in a 'contact' position in a maximum-security male prison." (*Id.,* at p. 335 [53 L.Ed.2d at p. 801].) It was the extensive contact between the guards and. prisoners that convinced the court of the high likelihood of an attack upon a female guard by an inmate. (See *Long* v. *State Personnel Bd.,* *supra,* 41 Cal.App.3d 1000.) There, a female minister was denied employment as a chaplain at a state youth training center. The court rejected her title VII complaint, ruling that male-only status was a bfoq because of the real danger of sexual attack inherent in the course of the chaplain's normal activities which required extensive isolated contact between the chaplain and inmates. (*Id.,* at p. 1004.)

Subsequent cases have limited the *Dothard* holding to similar factual settings; i.e., only where the possibility of physical injury to the female applicant is particularly high. (See *Smith* v. *Fairman* (7th Cir. 1982) 678 F.2d 52, 54; *Gunther* v. *Iowa State Men's Reform.* (8th Cir. 1980) 612 F.2d 1079, 1085.)

Moreover, except in extreme circumstances, government agencies must attempt to make *suitable accommodations* in matters where the privacy interests of the population to be served clash with the applicant's right to obtain a job without fear of sexual discrimination. (See *Smith* v. *Fairman, supra,* 678 F.2d at p. 55.) It is recognized that prison inmates do have some right to avoid unwanted intrusions by persons of the opposite sex. (*Ibid.*) In the *Fairman* case, the accommodation was achieved by directing the female guards not to search the genital area of male prisoners during a limited frisk-type search.

In the present case, the position of cook at the male facility in Santa Rita is different from the guard position at issue in the *Dothard* case. The

cook at the Santa Rita facility will not be in "contact" nor is she likely to be in a physically threatening position with inmates because she will be working in a kitchen that is separate from the inmates' eating facilities. Additionally, at no time will the cook be alone with the prisoners because a guard monitors all of the activities that occur in the kitchen.

Although the County argued that the security of the prison would be endangered if a female cook were to be employed, the Commission found that no evidence was presented to support this claim. To the contrary, while working as a cook at the County's juvenile facility, Caulfield had to discipline males who are of similar size to the inmates at Santa Rita, albeit younger. Willie McElvaine, a former cook at the male Santa Rita facility, testified that he never had any particular problems with the inmates and that he had a deputy to help in the event of an uncooperative inmate. He also testified that he felt that a woman could perform the duties of cook at Santa Rita facility. There was also evidence that the women's facility at Santa Rita was as violent as the men's facility.

Accordingly, the record supports the finding that the hiring of Caulfield would not have unreasonably increased the likelihood of physical injury to herself nor would it have endangered the security of the prison.

The privacy interests of the male Santa Rita inmates are not seriously threatened. Women lawyers, psychologists and other authorized female visitors visited the Santa Rita jail without any appreciable loss of privacy to the inmates. The former cook, McElvaine, testified that in order to see into one of the day rooms[3] from the kitchen, a person would have to peer through one of the windows located between the kitchen and the day room. He also testified that the toilets and showers could not be seen even if a person did lean over and look through the window.

The County is also concerned about the inmates' privacy since the prison guards conduct strip searches in a hall outside of the kitchen. Testimony indicated that a person would have to bend around a corner in order to see this hall through a window from the kitchen.

Caulfield's hiring would not present an intrusion into the inmates' privacy and, at most, presents an inconvenience for which reasonable and inexpensive accommodations could be made; the County could cover the kitchen windows facing the day rooms and hall to prevent any possible viewing of male inmates by a female cook; or limit the time of day strip searches are per-

---

[3]These rooms contained the inmates' toilets and showers.

formed. There is substantial evidence to support the Commission's findings that the male-only designation is not a bona fide occupational qualification.

Once a finding of discrimination has been made, Government Code section 12970, subdivision (a) authorizes a Commission to award damages in the following manner: "If the commission finds that a respondent has engaged in any unlawful practice under this part, it shall state its findings of fact and determination and shall issue and cause to be served on the parties an order requiring such respondent to cease and desist from such unlawful practice and to take *such action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, restoration to membership in any respondent labor organization, as, in the judgment of the commission,* will effectuate the purposes of this part, and including a requirement for report of the manner of compliance." (Italics added.)

■ The County urges that the Commission should have deducted unemployment benefits received by Caulfield from her award of backpay. As mentioned above, Caulfield was awarded, with interest, $14,388.85 as backpay. The United States Supreme Court has previously held that it was not an abuse of discretion by the National Labor Relations Board to refuse to deduct unemployment compensation payments from an award of backpay where there have been labor violations. (*National Labor Relations Board v. Gullett Gin Co.* (1951) 340 U.S. 361 [95 L.Ed. 337, 71 S.Ct. 337].) Federal courts have applied the remedy of *Gullett Gin* to cases involving employment discrimination: *Brown v. A.J. Gerrard Mfg. Co.* (11th Cir. 1983) 715 F.2d 1549, 1550-1551; *Kauffman v. Sidereal Corp.* (9th Cir. 1982) 695 F.2d 343, 346-347; *Richardson v. Restaurant Marketing Associates, Inc.* (N.D.Cal. 1981) 527 F.Supp. 690, 698-699.

In *Kauffman,* the Ninth Circuit specifically found that unemployment benefits could not be offset against a backpay award in a discrimination suit: "We are persuaded by the reasoning of both *Gullett Gin* and the trial judge and accordingly hold that unemployment benefits received by a successful plaintiff in an employment discrimination action are not offsets against a backpay award. [Fn. omitted.]" (*Kauffman v. Sidereal Corp., supra,* 695 F.2d at p. 347.) We see no reason to depart from this line of cases and conclude that the Commission properly included unemployment benefits in Caulfield's award of backpay.

The Commission also awarded Caulfield an additional $429.94 which represented accrued sick leave and dental and medical benefits that would have accumulated had Caulfield been originally hired by the County in October

1974. The County contends that these benefits should not have been included in Caulfield's award. We disagree.

The majority of courts appear to favor the inclusion of fringe benefits as part of an award of backpay. In *United States* v. *Lee Way Motor Freight, Inc.* (10th Cir. 1979) 625 F.2d 918, the court included contributions to a company benefit package in a backpay award: "A normal part of the back pay award should have been the inclusion of the company's health, welfare and pension benefits." (*Id.,* at p. 945; see, e.g., *Richardson* v. *Restaurant Marketing Associates, Inc., supra,* 527 F.Supp. at p. 698 [allowing the plaintiffs to recover the amount that their company would have contributed to a union health and welfare fund].) We find that the Commission's inclusion of fringe benefits in Caulfield's award of backpay was proper.

The judgment denying the petition for a writ of administrative mandamus is affirmed.

King, J., and Haning, J., concurred.